IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 15, 2004 Session

## STATE OF TENNESSEE v. JEREMY TUCKER DAVIS, ALIAS JERRY TUCKER DAVIS

**Appeal from the Criminal Court for Hamilton County**
**Nos. 239457, 240681, 240682, & 240919      Douglas A. Meyer, Judge**

—————————

**No. E2003-02214-CCA-R3-CD - Filed November 15, 2004**

—————————

A Hamilton County Criminal Court jury convicted the defendant of the attempted first degree murder of a police officer, and the defendant pled guilty to twenty-nine charges, including multiple counts of car burglary, felony theft, and misdemeanor theft. The trial court sentenced him as a Range I, standard offender to twenty-five years for the attempted murder conviction and as a Range II, multiple offender to an effective sentence of six years for the remaining convictions. The trial court ordered that the twenty-five-year and six-year sentences be served consecutively to each other and consecutively to a six-year revoked probation sentence. The defendant appeals, claiming that the trial court erred (1) by refusing to dismiss a juror for cause; (2) by refusing to compel the state to provide the defense with the police department's written use-of-force policy; (3) by refusing to allow the defense to cross-examine police officers about the use-of-force policy; (4) by refusing to allow an expert to testify about the victim's excessive use of force against the defendant; (5) by refusing to instruct the jury on deadly force; and (6) by ordering consecutive sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

William M. Speek, Chattanooga, Tennessee, for the appellant, Jeremy Tucker Davis, alias Jerry Tucker Davis.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William H. Cox, III, District Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's shooting Chattanooga Police Officer David W. Mays. Thomas Manghane testified that on January 8, 2002, he lived on North Joiner Road in the East Brainerd area of Chattanooga and went outside about 4:30 a.m. to warm up his and his wife's cars. He found that someone had broken into both cars and taken items from them. His wife telephoned the police, and when the police arrived, Mr. Manghane discovered that someone also had broken into the storage building behind his house and had taken his work jacket. Tony Cabrera, who lived on Lenny Lane, and Misty Jackson, who lived on Eric Drive, testified that they also lived in the East Brainerd area and that someone broke into their cars on January 8th.

Officer Craig Allen Nabors of the Chattanooga Police Department testified that he was working in the East Brainerd area in the early morning hours of January 8, 2002, that the police department received reports of burglaries in the area, and that the department dispatched a "be-on-the-lookout" (BOLO) for two suspicious males wearing dark clothing and riding bicycles. Officer Nabors responded to the burglary call at Mr. Manghane's home and then went to the Maxi Muffler parking lot on North Joiner Road to complete his report. While parked in the lot, Officer Nabors saw two white males who were riding bicycles and matched the BOLO description. Officer Nabors pulled out of the parking lot and began following the suspects. At some point, the suspects looked back, saw Officer Nabors, and began pedaling faster. Officer Nabors followed the suspects behind a grocery store, got out of his patrol car, and ordered them to stop. However, the suspects rode off in different directions.

One of the suspects rode through a wooded area to John Henry Road and turned west. Officer Nabors chased the suspect, who was the defendant, on foot but lost sight of him. As Officer Nabors chased the defendant, the defendant turned around repeatedly, looked at the officer, and acted like he was reaching for something in his jacket. At the corner of North Joiner and John Henry, an officer in a patrol car met Officer Nabors. Officer Nabors heard Officer Mays over the police radio and saw Mays' patrol car in a ditch on North Joiner Road. Officer Nabors and the other officer began looking for Mays and found him at the end of a driveway. Officer Mays was confused and told them that he had been shot.

Officer David W. Mays of the Chattanooga Police Department testified that on January 8, 2002, he was on patrol in the East Brainerd area and heard the BOLO. Later, Officer Mays heard Officer Nabors say over the police radio that he was in a foot pursuit, and Officer Mays drove in Nabors' direction. Officer Mays saw the defendant riding a bicycle and followed him. The defendant turned into a wooded driveway, and Officer Mays continued following the defendant in his patrol car. Officer Mays bumped the defendant's bicycle with the car, and the defendant jumped or fell off the bicycle. Officer Mays got out of the car and told the defendant, "Come here." The defendant tried to run, Officer Mays caught him, and they struggled. Officer Mays threw the defendant onto the ground, and the defendant, who was on his back, began flailing his arms and legs. Using a "closed hand technique," Officer Mays struck the defendant twice on the side of the face. The defendant rolled onto his stomach, and Officer Mays tried to pull back the defendant's right arm

in order to handcuff him. Officer Mays also put his knee on the back of the defendant's head and told him, "Give me your hands." When the defendant refused to be handcuffed, Officer Mays sprayed the defendant with pepper spray, and the defendant yelled for help. Officer Mays decided to stop struggling with the defendant and to hold him at gunpoint until backup officers arrived. As Officer Mays stepped away from the defendant and began to unsnap his gun holster, the defendant shot him in the face.

Officer Mays testified that he did not see the defendant's gun but heard a gunshot and felt gunpowder. He fell, began crawling away from the defendant, and felt another shot in his back. Officer Mays fell down an embankment and into some water. He called over his police radio that he had been shot and fired two shots in the defendant's direction. He then heard the defendant open his patrol car's door and heard the car back up. As the defendant backed up the car, Officer Mays stood up and fired a shot above the driver's side headlight. The car's back tires went into a ditch, and the car stopped moving. The defendant got out of the car and fled, and Officer Mays hid behind a tree and reloaded his gun.

On cross-examination, Officer Mays testified that before chasing the defendant, he had not heard any reports that the suspects were violent. He said that after he heard Officer Nabors report the foot pursuit, he drove to Joiner Road because he thought the suspects would come out of the woods and onto the road. He said that he hit the defendant's bicycle in order to end the pursuit and acknowledged that he may have flipped the defendant off the bicycle. He denied striking the defendant more than twice but acknowledged that in a statement to Sergeant Tim Carroll shortly after the shooting, he may have said he hit the defendant "a whole bunch of times." He said, though, that he was still in shock when he gave the statement. Officer Mays acknowledged that he was trained to stop fleeing suspects but said that he was not trained on how to use a car to stop them. He said that a bullet did not strike him in the face but that his face suffered gunpowder burns. He said that his bulletproof vest prevented a bullet from going into his back but that his back was injured.

Connie Butler testified that she lived on North Joiner Road in East Brainerd and that she went outside about 5:30 a.m. on January 8 to feed her cats. It was dark outside, and Ms. Butler heard gunshots and saw blue lights on a police car, which backed up quickly. Ms. Butler entered her home, looked out her window, saw the police car in a ditch, and telephoned 9-1-1.

Christopher Long testified that he lived on Jenkins Road in the East Brainerd area. Around lunchtime on January 8, he was working in his home and heard a muffled cough. He went downstairs to investigate and looked outside but did not see anyone. Mr. Long went upstairs and heard someone cough again. He went downstairs, opened his basement door, turned on the light, and saw someone standing in his basement. The person had a hood over his head and was staring at the floor, and Mr. Long could not see the person's face. He turned off the light, dead-bolted the door, and telephoned the police.

Sergeant David Roddy of the Chattanooga Police Department testified that he was a SWAT team leader and responded to the call at Mr. Long's house. The police believed that the defendant

was locked in Mr. Long's basement, and SWAT team members surrounded the home. A police officer opened the basement door and told the defendant that he was going to send in a police dog. When the defendant did not respond, the officers released the dog into the basement. Sergeant Roddy heard the dog growling, indicating that the dog had apprehended the defendant. Sergeant Roddy and the other officers went into the basement and saw that the dog had grabbed the defendant's left forearm. The defendant had his right hand in his right jacket pocket, and the officers told him to show them his hand. The defendant refused, and another officer pinned the defendant to the ground. The defendant began to resist, and an officer held the defendant's head in order to prevent him from thrashing. Sergeant Roddy said that he tried to pull the defendant's right hand out of the pocket and that he hit the defendant across the nose with a "palm-heel" strike, which he said was a good stunning technique. Sergeant Roddy pulled the defendant's hand out of his pocket, and the officers handcuffed him. The officers began patting down the defendant and found a .38 revolver in his right jacket pocket. On cross-examination, Sergeant Roddy testified that the palm-heel strike does not cause serious injury and that he did not recall anyone else hitting the defendant. He denied hitting the defendant on the side of his head, around his lips, or in his eye.

Officer Todd Royval of the Chattanooga Police Department testified that he was a member of the SWAT team on January 8 and remained outside while other officers went into the basement. When the officers brought the defendant outside, the defendant was struggling and the officers were having to drag him. Officer Royval searched the defendant and found a revolver in his right coat pocket. Later, Officer Royval learned the coat belonged to Thomas Manghane. Officer Royval also found a Leatherman-type tool, a mini flashlight, a Swiss army knife, a corkscrew, a file, keys, and a coin purse in the defendant's pockets.

Sergeant Mike Mathis, a detective in the Chattanooga Police Department's Major Crimes Division, testified that he was the lead investigator in the shooting of Officer Mays and talked with the defendant at the police department a few hours after the defendant was arrested. The defendant told Sergeant Mathis that he did not know why he was there and that he had not done anything.

Timothy Commers of the Chattanooga Police Department testified that he examined the evidence in the case, including Officer Mays' bullet proof vest. The vest had a bullet hole in the rear panel, and Mr. Commers recovered a bullet from the vest. Shelly Betts, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified that she examined the gun recovered from the defendant and the bullet recovered from the vest. She concluded that the defendant's gun fired the bullet.

Tischia Watts, the defendant's sister-in-law, testified for the defendant that a day or two before this incident, she and the defendant went to her grandmother's house in order to steal a gun. She and the defendant were addicted to methamphetamine and needed the gun in order to trade it for drugs. Ms. Watts took the gun from her grandmother's bedroom and gave it to the defendant. On the night of January 7, Ms. Watts saw the defendant at a friend's house. She asked the defendant if he had traded the gun, and he said that he had not traded it because he needed to get more items

to trade for drugs.  The defendant left the friend's house shortly thereafter.  On cross-examination, Ms. Watts said the defendant had stolen items before in order to trade them for drugs.

Brenda Weekley testified that she lived on Joiner Road and heard a commotion in front of her house on January 8.  When she looked out her window, she saw a man standing in the street and talking loudly to another man in a car.  It was dark outside, but Ms. Weekley thought that the car was a police cruiser.  She then heard three to five gunshots, a pause, and five to six more gunshots.  Soon after she heard the shots, police cars arrived.  On cross-examination, Ms. Weekley acknowledged that what she saw was consistent with one police officer stopping his patrol car to pick up another officer, who was on foot.  The jury convicted the defendant of the attempted first degree murder of Officer Mays.

## I.  DISMISSAL OF JUROR

The defendant claims that the trial court erred by refusing to dismiss a potential juror for cause because the potential juror had a prior relationship with Officer Mays.  He contends that he was prejudiced by the error because the trial court's refusal forced him to use a peremptory challenge to remove the potential juror from the panel and because he used all of his peremptory strikes.  The state claims that the trial court correctly determined that dismissing the potential juror for cause was unnecessary.  We agree with the state and hold that the trial court did not abuse its discretion by refusing to dismiss the potential juror for cause.

Rule 24(b), Tenn. R. Crim. P., governs challenges to potential jurors for cause and states, in pertinent part, that

> [any] party may challenge a prospective juror for cause if:
>
> (1) there exists any ground for challenge for cause provided by law;
>
> (2) the prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror.  Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability.  A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure.  If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed.  If the prospective juror admits to having formed an opinion, he or she shall be subject to

challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

A trial court has wide discretion in ruling on the qualifications of jurors. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). Even "the formation of an opinion on the merits will not disqualify a juror if she can lay aside her opinion and render a verdict based on the evidence presented in court." State v. Sammons, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982). The "failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993).

During voir dire, the trial court asked the prospective jurors if any of them knew the parties involved in the case or knew of any reason why they could not be impartial. Juror Baumgardner told the trial court that the victim was her former student. Upon further questioning by the state, Ms. Baumgardner said that she had been a librarian at East Ridge High School for many years and that the victim had worked for her in the library. Upon questioning by the defendant, Ms. Baumgardner said that she had liked most of the students who had worked for her, that she could not say she had liked the victim more than her other students, that she had not seen the victim in a long time, and that she had read in the newspaper about his being shot. Ms. Baumgardner also stated that she could be fair and that her relationship with the victim would not "get in the way" of the trial. The defense moved to strike Ms. Baumgardner for cause based upon her "personal relationship" with the victim. The trial court stated that it did not believe Ms. Baumgardner and the victim had a personal relationship and refused to strike her from the panel. Later, a peremptory challenge was used to dismiss Ms. Baumgardner from the jury.

We hold that the trial court did not abuse its discretion by refusing to excuse Ms. Baumgardner for cause. Ms. Baumgardner testified that although the victim was her former student, she could be fair. Moreover, although the defendant may have had to use a peremptory challenge to remove her and may have exhausted all of his peremptory challenges, he has failed to make any showing that his having to use a peremptory challenge to strike her from the panel resulted in an incompetent juror serving on the jury.

## II. USE-OF-FORCE POLICY

The defendant claims that the trial court erred by refusing to compel the state to turn over the Chattanooga Police Department's written use-of-force policy that was in effect at the time of the shooting. He contends that the policy was relevant to his theory of self-defense and that he was entitled to the policy pursuant to Rule 16(a)(1)(C), Tenn. R. Crim. P. The state argues that the trial court properly determined that Rule 16 did not require the state to turn over the policy and that the defendant has failed to show that the policy was relevant or helpful to his self-defense theory. In his reply brief, the defendant argues that he could not show the policy's relevance because he never received the policy. We agree with the state that the defendant has failed to show that he was harmed by the trial court's ruling.

Before trial, the defendant asked the trial court to compel the state to turn over the police department's use-of-force policy that was in effect at the time of the shooting. In a hearing, the defense told the trial court that the state had turned over a use-of-force policy but that it was not the policy that was in effect on January 8, 2002. The state argued that although it had turned over a use-of-force policy that was in effect after the shooting, it did not want to give the defense the policy that was in effect at the time of the shooting because the state did not want the jury to "follow a red herring and find that the officer is guilty of not following departmental policy." The defense argued that if the policy revealed Officer Mays had acted with more force than the policy allowed, then the policy would be relevant to show that the defendant was justified in shooting the officer. The trial court disagreed, holding that the policy was irrelevant.

During a second pretrial hearing, the defense again claimed that it was entitled to the policy. The state argued that the defendant could testify at trial about his belief that he needed to defend himself from Officer Mays. The trial court ruled that the policy would confuse the jury and denied the defendant's request. During the hearing on the defendant's motion for new trial, the defense argued that the trial court had erred by refusing to compel the state to turn over the policy. The defense told the trial court that the state had turned over a second policy during the trial but that the second policy was older than the first policy and still was not the policy that was in effect at the time of the shooting. In its order denying the motion for new trial, the trial court noted that although the two policies turned over by the state were not in effect at the time of the shooting, they did not appear to differ from the policy that was in effect at the time of the crimes. The trial court held that because the "policy in question did not reveal any less forceful method of arrest . . . that the prior and subsequent policies did not reveal," any error in not forcing the state to turn over the policy in question was harmless.

Our review of the record reveals that the policy given to the defense by the state before trial is titled "ADM-5 - USE OF FORCE" and has a "Date of Issue" as February 6, 2002, almost a month after the shooting. The policy also provides that it "Amends/Supersedes: ADM-5 (04/01/01)." The policy given to the defense by the state during the trial is titled "ADM-5 - USE OF FORCE" and has a "Date of Issue" as September 9, 2000. The parties agree that a third policy, which was not turned over to the defense and is not in the record before us, was in effect at the time of the crimes.

Under Tenn. R. Crim. P. 16(a)(1)(C), the state is required to "permit the defendant to inspect and copy or photograph . . . documents . . . which are within the possession, custody or control of the State," and material to the defendant's preparation of his defense, intended for use by the state, or were obtained from the defendant. If a party fails to comply with a discovery request, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Whether a defendant has been prejudiced by the state's failure to disclose information is a significant factor in determining an appropriate remedy. State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). When arguing that the state violated Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).

The state contends that the defendant has failed to show that he was harmed by not receiving the policy that was in effect at the time of the shooting. The defendant argues that showing harm is impossible because he never received the policy. We disagree with the defendant. We have reviewed the two policies that the state turned over to the defense, and they are almost identical. The only difference between the two policies is that a brief paragraph on the use of police dogs as weapons is in the February 2, 2002 policy but absent from the September 9, 2000 policy. In light of the fact that the defendant had these two policies and that these policies are obviously similar to the policy in question, we agree with the state that the defendant could have shown how he was harmed by the trial court's refusing to compel the state to turn over the policy in effect at the time of the shooting. Because he has failed to demonstrate prejudice, we hold that the trial court did not err by refusing to compel the state to produce the withheld policy.

## III. CROSS-EXAMINATION OF POLICE OFFICERS

The defendant contends that the trial court erred by refusing to allow him to cross-examine the state's witnesses about Officer Mays' use of force against him. Specifically, he argues that he should have been allowed to ask Officer Mays and Officer Nabors as to whether Mays' using the patrol car to knock him off his bicycle violated the police department's use-of-force policy and constituted deadly force. He contends that showing Mays violated the policy would have supported his claim that Mays used excessive force, that he feared for his life, and that he shot Mays in self-defense. The state argues that the policy was not relevant to the defendant's claim of self-defense. We agree with the state.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Pursuant to T.C.A. § 39-11-611(a), a person can act in self-defense under the following circumstances:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Regarding a person's use of self-defense against a police officer, the self-defense statute provides that the

threat or use of force against another is not justified to resist a halt at a roadblock, arrest, search, or stop and frisk that the person knows is being made by a law enforcement officer, unless:

(1) The law enforcement officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and

(2) The person reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary.

T.C.A. § 39-11-611(e). According to the Sentencing Commission Comments, self-defense not only entails what a defendant actually believes, but also entails what is a reasonable belief under the circumstances. As stated in State v. Bult, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998), "This means that the defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under these statutory defenses. Thus, the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." In Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989), a case involving excessive force under 42 U.S.C. § 1983, the United States Supreme Court explained that the Fourth Amendment's objective reasonableness standard must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody the allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation."

Some federal and state courts have held that police department use-of-force policies are relevant when evaluating excessive use-of-force claims. For example, in Scott v. Henrich, 39 F.3d 912 (9th Cir. 1994), a wife sued police officers for excessive force after they shot and killed her husband, who had barricaded himself in an apartment building. The plaintiff tried to argue that the officers had violated police department guidelines when they shot her husband without first calling for assistance or negotiating with him. The appellate court stated that the guidelines were relevant "when one of their purposes is to protect the individual against whom force is used." Id. at 915-16. Concluding that the purpose of the guidelines in question was to protect police officers and innocent bystanders, not suspects, the appellate court held that the guidelines were irrelevant. In Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003), the victim's guardian sued police officers and the city after the officers' use of force against the victim during an arrest left the victim in a coma. In reversing summary judgment for the defendants, the appellate court considered the officers' use-of-force guidelines, stating that "'it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned.'" Id. at 1059 (quoting Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir. 1998)). In Ludwig v. Anderson, 54 F.3d 465, 472 (8th Cir. 1995), a mother sued two police officers after they shot and killed her emotionally disturbed son. Id. at 916. In

determining whether the officers' use of deadly force against the victim was objectively reasonable, the appellate court looked to the police department's manual, which specifically addressed how officers were to handle emotionally disturbed persons. The court stated that while these "'police department guidelines do not create a constitutional right,' they are relevant to the analysis of constitutionally excessive force." Id. at 472 (quoting Cole v. Bone, 993 F.2d 1328, 1334 (8th Cir. 1995)).

Relying on Ludwig, the Indiana Court of Appeals also held that a police department policy was relevant to a defendant's excessive use-of-force and self-defense claims. In Shoultz v. State, 735 N.E.2d 818 (Ind. Ct. App. 2000), an officer hit the defendant on the head with a flashlight while trying to arrest him for disorderly conduct and resisting arrest. Although the trial court had affirmed the defendant's convictions for those offenses, the appellate court reversed, holding that the officer used excessive force against the defendant. In analyzing whether the officer's use of force was objectively reasonable, the court looked to the police department's guidelines, which specifically prohibited officers from using flashlights to hit suspects unless "absolutely necessary." Id. at 824. Finally, in Bedley v. State, 374 S.E.2d 841 (Ga. Ct. App. 1988), the defendant police officer was convicted of simple battery for striking a jail inmate. In contesting the sufficiency of the evidence on appeal, the defendant claimed that the trial court had erred by allowing into evidence a police department manual outlining procedures on use of force. The appellate court ruled that because the defendant's defense had been "that his use of force was justified, and the manual directly related to the defense of justification, it was therefore admissible." Id. at 842.

On the other hand, some federal and state cases have held that police department policies are irrelevant to excessive use-of-force claims. For example, in Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992), the Sixth Circuit Court of Appeals stated,

> Under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983.

In Scott v. Edinburg, 346 F.3d 752 (7th Cir. 2003), an off-duty police officer shot and killed a man who was trying to steal the officer's personal car. The victim's family sued the officer and the city, claiming that the officer used excessive force. Finding that the officer's use of force had been objectively reasonable, the trial court granted summary judgment. On appeal, the plaintiffs argued that an expert's testifying that the officer had violated police department policies precluded summary judgment. However, in upholding the lower court, the appellate court stated that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." Id. at 760.

Similarly, in Mace v. City of Palestine, 213 F. Supp. 2d 691 (E.D. Tex. 2002), a police officer shot and killed a man who had wielded a sword. A representative for the man's estate sued the city

under 42 U.S.C. § 1983, claiming that the officer used excessive force. In support of her argument, the plaintiff noted that the officer's actions during the confrontation had violated the police department's use-of-force policy. However, the district court held that the officer's violation of the policy was irrelevant "if his use of deadly force against an intoxicated, disturbed, threatening, individual in close proximity to him and his other officers, armed with a sword was reasonable." Id. at 697. In Woods v. Jefferson County, 2003 U.S. Dist. LEXIS 605 (W.D. Ky. Jan. 8, 2003), the plaintiff sued the police department under 42 U.S.C § 1983 after he was injured during his arrest. The defendant claimed that the arresting officer's written reprimand for violating police policy during the arrest supported his excessive force claim. However, the court disagreed, stating,

> In evaluating whether an officer's use of force is constitutional under Graham, the issue is whether it was objectively reasonable under all of the circumstances confronting the officer, not whether the officer violated a city or departmental policy. Whether an officer followed or violated police department policy and guidelines is not relevant under Graham.

Id. at *10 (citation omitted).

In Lozano v. State, 584 So. 2d 19 (Fla. Dist. Ct. App. 1991), the defendant officer was convicted of manslaughter for shooting and killing a suspect during a high-speed chase. Over the defendant's objection, the trial court admitted into evidence the fact that the defendant had violated the police department's policy regarding deadly force and shooting at a moving vehicle. The appellate court ruled that the trial court erred by admitting the policy and cited other cases holding the same. Id. at 24 (citing Pitts v. State, 473 So. 2d 1370, 1373-74 (Fla. Dist. Ct. App. 1985) (reversing a police officer's conviction for vehicular homicide when police policy manuals were admitted as evidence that he had operated his police vehicle in a reckless manner), app. denied (Fla. 1986); City of St. Petersburg v. Reed, 330 So. 2d 256, 258 (Fla. Dist. Ct. App. 1976) (stating that "statewide standards for the use of deadly force must be controlling" and that "introduction into evidence of the safety order was error"), app. denied (Fla. 1976); Chastain v. Civil Serv. Bd., 327 So. 2d 230, 232 (Fla. Dist. Ct. App. 1976) (stating that a police department's deadly force policy "would not affect the standard by which the officers' criminal or civil liability is measured")). In State v. Leslie Ann Hebeler, 2001 Iowa App. LEXIS 363 (Iowa Ct. App. June 13, 2001), a police officer stopped the defendant for speeding and arrested her when she refused to sign the speeding citation. The defendant was convicted of interference of official acts resulting in bodily harm. On appeal, she claimed the trial court erred by refusing to admit into evidence the police department's manual, which provided that officers were to treat the public in a positive and respective manner. The appellate court disagreed, stating that it was the officer's conduct at issue, "not the comparison of that conduct to policies that are not claimed or shown to have legally binding affect." Id. at *19-20.

Turning to the present case, the issues that the jury had to resolve were (1) whether Officer Mays' conduct violated statutory standards concerning use of reasonable force to arrest the defendant

and (2) whether the defendant's use of force against Mays fell within statutory standards that allow the use of reasonable force to resist unlawful force. The defendant claims that being able to show Mays violated the use-of-force policy would have demonstrated that the officer used excessive force. However, we conclude that federal and state cases holding such police department policies to be irrelevant take the more reasoned approach. In resolving excessive use-of-force claims, juries are to use an objectively reasonable standard that must be based on the circumstances that occurred at the time of the arrest. Whether an officer violated a police department policy, which has no legally binding effect, will be irrelevant to whether the officer was acting appropriately under the circumstances. We conclude that the trial court did not err in refusing to allow the defendant to question the officers about the policy.

In any event, even if the trial court erred, such error was harmless. After Officer Mays struck the defendant with the patrol car and knocked the defendant off his bicycle, the defendant was able to resist Officer Mays' use of force and pull a gun. The defendant shot Officer Mays twice, once in the face and once in the back after the officer had fallen to the ground and was crawling away from him. In light of these facts, we hold that any error regarding the defendant's inability to question the officers about the police department's policy was harmless.

## IV. EXPERT TESTIMONY

Next, the defendant claims that the trial court erred by refusing to allow an expert to testify that Officer Mays used excessive force against him. He argues that the expert's opinion, which was based in part upon the Chattanaooga Police Department's use-of-force policy, was necessary to show that he was justified in shooting Officer Mays. He contends that the expert had specialized experience in police training and tactics and would have been able to explain to the jury that Officer Mays' using a patrol car to knock him off his bicycle, hitting him, and spraying him with pepper spray amounted to excessive force. The state claims that the trial court properly excluded the expert's testimony. We conclude that any error was harmless.

The record reflects that after the defense received the February 6, 2002 use-of-force policy, it forwarded the policy to Phillip L. Davidson, a former police officer and purported expert on excessive use-of-force. Using the policy, the preliminary hearing transcript, and the Chattanooga Police Department's interview with Officer Mays, Mr. Davidson prepared a written report in which he concluded that Officer Mays had used deadly force against the defendant when Officer Mays struck the defendant's bicycle with the patrol car. He also concluded that the officer had used excessive force against the defendant when the officer hit the defendant with his fists and sprayed the defendant with pepper spray. In his opinion, the defendant "quite justifiably began to defend himself." The trial court refused to let Mr. Davidson testify, stating that Mr. Davidson was not qualified to give an opinion and that Mr. Davidson was "taking the position of sitting as a juror."

The admissibility of expert testimony is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. State v. Tizard, 897 S.W.2d 732, 748 (Tenn. Crim. App. 1994). Rule 702, Tenn. R. Evid., states, "If scientific, technical, or other specialized

knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703, Tenn. R. Evid., states, "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Determinations concerning the admissibility of expert testimony, including the basis of the expert opinion, are within the discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993); see also State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). However, the jury determines the weight and credibility of the expert's testimony. State v. Anderson, 880 S.W.2d 720, 732 (Tenn. Crim. App. 1994).

Initially, we note that although Mr. Davidson's written report is in the appellate record, Mr. Davidson's curriculum vitae is not attached to the report and the defense made no offer of proof regarding his credentials. Therefore, we are unable to determine whether the trial court erred in its ruling that Mr. Davidson was not qualified to testify. In any event, even if the trial court erred by refusing to let Mr. Davidson testify, we hold that the error was harmless. The defense questioned Officer Mays extensively during cross-examination about his using the patrol car to knock the defendant off the bicycle, about his hitting the defendant in the face, and about his spraying the defendant with pepper spray. Officer Mays acknowledged that he had not been trained on how to use a patrol car to stop a suspect from fleeing on a bicycle and that his using the patrol car to knock the defendant off the bicycle could have caused the defendant to break his neck or suffer a brain injury. He also testified that he hit the defendant in the face and sprayed the defendant with pepper spray despite having no indication that the defendant had a gun. The jury was well aware of Officer Mays' actions against the defendant.

Moreover, as previously noted by this court, the evidence revealed that after the defendant fell off the bicycle, he jumped up, tried to run from Officer Mays, and struggled violently against Officer Mays' attempts to handcuff him. When Officer Mays stopped struggling with the defendant, the defendant pulled a gun and shot Officer Mays twice. The defendant fired one of those shots into Officer Mays' back as Mays crawled away from him. In light of the evidence, we hold that even if Mr. Davidson had testified favorably for the defense, no jury would have concluded that the defendant acted in self-defense. Thus, the defendant is not entitled to relief.

## V. DEADLY FORCE INSTRUCTION

The defendant claims that the trial court erred by refusing to instruct the jury on deadly force. He argues that in light of Officer Mays' testimony that the defendant could have been severely injured when Mays struck him with the patrol car, such an instruction was warranted. The state contends that the trial court did not err by refusing to give the instruction. We hold that the trial court's refusal was harmless error.

A defendant has a right to have each issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the trial court. State v. Brown, 836 S.W.2d 530, 553 (Tenn. 1992). A trial court should give a requested instruction if (1) it is supported by the

evidence, (2) it embodies the party's theory of the case, (3) it is a correct statement of the law, and (4) its substance has not already been included in other portions of the charge. <u>See</u> <u>Mitchell v. Smith</u>, 779 S.W.2d 384, 390-91 (Tenn. Ct. App. 1989). A "deadly weapon" has been defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(5)(B). This court has held that a car can be a deadly weapon. <u>See</u> <u>State v. Tate</u>, 912 S.W.2d 785, 787-88 (Tenn. Crim. App. 1995).

The record reflects that the defense submitted to the trial court the following written instruction:

> Deadly force means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. A motor vehicle can constitute a deadly weapon.

The trial court refused to give the instruction, stating that the instruction was not warranted in this case because Officer Mays did not use his patrol car as a deadly weapon. The trial court did agree, however, to give a self-defense instruction. The trial court gave, in pertinent part, the following instruction:

> Self defense: Included in the defendant's plea of not guilty is his plea of self defense. When a person is assaulted by the use of force or attempted use of force in such a way as to create in his mind a reasonable belief that he is in imminent or actual danger of death or serious bodily injury, he will be justified in using force to defend himself, even to the extent of killing another human being.
>
> The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's use of attempted - - other's use or attempted use of unlawful force. The danger creating the belief of imminent death or serious bodily injury must be real or honestly believed to be real at the time, and must be founded upon reasonable grounds.
>
> . . . .
>
> In determining whether a defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it.
>
> . . . .
>
> The use of force against another to resist or evade an arrest that the defendant knows is being made by a law enforcement officer

is justified only if the law enforcement officer uses or attempts to use greater force than necessary to make the arrest, and the defendant reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of a greater force than necessary.

We believe the trial court erred by refusing to give the instruction. Whether or not Officer Mays used his patrol car as deadly force was for the jury to decide, not the trial court. Nevertheless, we hold that the error was harmless. Although the trial court did not specifically instruct the jury on deadly force, the court did instruct the jury that in considering the defendant's self-defense claim, it could consider all of the facts leading up to the shooting, which included Officer's Mays' knocking the defendant off the bicycle. We note that after Officer Mays hit the defendant with his patrol car, the defendant jumped up, tried to run, and struggled with Officer Mays so violently that Officer Mays could not handcuff him even after Officer Mays struck the defendant with his fists and sprayed the defendant with pepper spray. In light of the thorough self-defense instruction given by the trial court and in light of the facts of the case, we hold that the trial court's error in refusing to instruct the jury on the requested special instruction was harmless.

## VI. CONSECUTIVE SENTENCING

Finally, the defendant claims that the trial court erred by ordering him to serve the effective six-year sentence he received for the multiple burglary and theft convictions consecutively to the twenty-five-year sentence he received for the attempted first degree murder conviction. He acknowledges that pursuant to T.C.A. § 40-35-115(b)(6), the trial court could order the sentences in the present case to run consecutively to a prior revoked probation sentence because he committed the crimes in this case while on probation. See T.C.A. § 40-35-115(b)(6) (providing for consecutive sentencing if the trial court finds by a preponderance of the evidence that the defendant committed the offenses while on probation for a prior crime). However, he claims that the trial court misinterpreted T.C.A. § 40-35-115(b)(6) as allowing for the six-year and twenty-five-year sentences to run consecutively to each other. The state argues that the trial court properly sentenced the defendant. We agree with the state.

When a defendant appeals the length of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. T.C.A. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169. Concurrent or consecutive sentencing is left to the sound discretion of the trial court. State v. Hastings, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999).

Tennessee Code Annotated § 40-35-115(a) provides that if a defendant is convicted of more than one criminal offense, the trial court may order the sentences to run consecutively if any of the criteria listed under subpart (b) exists. One of those criteria is that the defendant is sentenced for an offense while on probation. T.C.A. § 40-35-116(b)(6). The defendant does not contest the fact that he committed the crimes in this case while he was on probation for prior offenses. Thus, by the plain language of the statute, the trial court could order him to serve his twenty-five-year and six-year sentences consecutively to each other. Moreover, the trial court could order that the defendant serve those sentences consecutively to his revoked probation sentence. See Tenn. R. Crim. P. 32(c)(2) (providing that a trial court may order a defendant to serve sentences for new convictions consecutively to "additional sentences not yet fully served"). The trial court did not abuse its discretion by ordering consecutive sentencing in this case.

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE