39 F.3d 912
 Doris A. SCOTT, individually and as Personal Representative
of the Estate of John William Scott, deceased,
Plaintiff-Appellant,
v.
James L. HENRICH; David J. Flamand; Butte-Silver Bow Law
Enforcement Agency; City of Butte; County of
Silver Bow, Defendants-Appellees.
 No. 91-35429.
 United States Court of Appeals,
Ninth Circuit.
 Submitted June 3, 1992.*
Decided Sept. 9, 1994.
Opinion Withdrawn Nov. 2, 1994.
Filed Nov. 2, 1994.
 
 Curtis G. Thompson, William D. Jacobsen, Jardine, Stephenson, Blewett & Weaver, Great Falls, MT, for plaintiff-appellant.
 Brendon J. Rohan, C. Richard Anderson, Poore, Roth & Robinson, Butte, MT, for defendants-appellees Henrich, Flamand, and Butte-Silver Bow Law Enforcement Agency.
 Gregory Black, Marshal Mickelson, Corrette, Smith, Pohlman & Allen, Butte, MT, for defendants-appellees City of Butte and County of Silver Bow.
 Appeal from the United States District Court for the District of Montana.
 Before: FARRIS, NORRIS and KOZINSKI, Circuit Judges.
 
 
 1
 Opinion by Judge KOZINSKI; Dissent by Judge NORRIS.
 
 ORDER
 
 2
 The opinion and dissent filed on September 9, 1994, are withdrawn. The attached revised opinion and dissent shall be filed in their place.
 
 OPINION
 
 3
 KOZINSKI, Circuit Judge.
 
 
 4
 Doris Scott contends that the police officer defendants acted unreasonably by killing her husband John Scott.[1] We consider the amount of proof needed to overcome a motion for summary judgment in a deadly force case under section 1983.
 
 Facts
 
 5
 Officers Flamand and Henrich were called to 701 West Park Street in Butte, Montana, in response to reports that a man was firing a gun there. A few minutes earlier, they had received reports of shots fired at a nearby address. When the officers arrived at the 701 West Park area, a motel manager pointed to the two-story apartment building across the street where the gunman had entered via one of the street-level doors. A boy named Jason Smith told Flamand that "he had seen a man fire a shot or a couple of shots ... and that [the man] was acting strange or crazy and he was staggering." Flamand then observed a man in the second-story window of the building.
 
 
 6
 Flamand and Henrich quickly approached the street-level door. Henrich banged and kicked the door and yelled something to the effect of "Police, police officers, open up." Flamand stood behind Henrich and covered him. A few minutes later, Henrich again banged the door and identified himself as a police officer. The officers then heard fumbling with the lock of the door. The door opened, and John Scott stood in the doorway. According to the officers, Scott held a "long gun" and pointed it at them. Officer Henrich fired a shot that missed Scott. Officer Flamand, apparently believing Scott had fired this shot, fired four shots at Scott, one of which caused the fatal wound.
 
 Discussion
 
 7
 * Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985); see also Graham, 490 U.S. at 396, 109 S.Ct. at 1872 (one of factors in determining reasonableness is "whether the suspect poses an immediate threat to the safety of the officers or others"). All determinations of unreasonable force "must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S.Ct. at 1872.
 
 
 8
 The officers here raise the defense of qualified immunity, which shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "In Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits." Hopkins v. Andaya, 958 F.2d 881, 885 n. 3 (9th Cir.1992). But, even though reasonableness traditionally is a question of fact for the jury, see, e.g., White v. Pierce County, 797 F.2d 812, 816 (9th Cir.1986); Akhil R. Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1179 (1991), defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.
 
 
 9
 Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story--the person shot dead--is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. Hopkins, 958 F.2d at 885-88; Ting v. United States, 927 F.2d 1504, 1510-11 (9th Cir.1991). In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.
 
 II
 
 10
 A. Plaintiff argues that the officers should have used alternative measures before approaching and knocking on the door where Scott was located. But, as the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them. See, e.g., Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); United States v. Martinez-Fuerte, 428 U.S. 543, 556-57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976). Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission. Instead, he would need to ascertain the least intrusive alternative (an inherently subjective determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment.
 
 
 11
 Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable. The officers here clearly did: It's hardly unreasonable for officers to take arms, knock on the door of an apartment and identify themselves as police when an armed man who, they are told, recently fired shots and is acting "crazy"[2] lurks inside.
 
 
 12
 B. Scott also argues the police officers' conduct violated police department guidelines for dealing with barricaded suspects. Under these guidelines, Scott contends, Henrich and Flamand shouldn't have tried to seize Scott immediately, but should instead have developed a tactical plan to deal with the situation, sealed the possible escape avenues, called for assistance, and tried to get Scott to surrender.
 
 
 13
 Assuming internal police guidelines are relevant to determining whether use of force is objectively reasonable, see Tennessee v. Garner, 471 U.S. 1, 18-19, 105 S.Ct. 1694, 1704-05, 85 L.Ed.2d 1 (1985), they are relevant only when one of their purposes is to protect the individual against whom force is used. Thus, if a police department limits the use of chokeholds to protect suspects from being fatally injured, see Maddox v. City of Los Angeles, 792 F.2d 1408, 1414 (9th Cir.1986), or restricts the use of deadly force to protect suspects from being shot unnecessarily, see Garner, 471 U.S. at 18-19, 105 S.Ct. at 1704-05, such regulations are germane to the reasonableness inquiry in an excessive force claim. But if, for example, the department bans high-speed chases in order to save gas, or to protect bystanders, a suspect arrested after an unauthorized chase can't complain about the violation of a rule not intended for his benefit.[3]
 
 
 14
 Both the guidelines at issue here and the context in which they appear in the police manual show they were meant to safeguard the police and other innocent parties, not the suspect. They state: "Policy: A barricaded suspect poses an extreme danger to officers who try to arrest him, as well as[ ] other people.... It is important to minimize the possibility of injury to the public and officers." ER E at 16. A violation of these guidelines might be deserving of discipline, but it's irrelevant to Scott's case.
 
 III
 
 15
 Scott contends that even if the conduct of the individual officers was objectively reasonable, the municipal defendants may still face liability under City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights. Here, the municipal defendants cannot be held liable because no constitutional violation occurred. As noted above, the actions of Officers Flamand and Henrich at all times were reasonable and proper: Both their initial decision to enter the building and their subsequent use of force fully complied with the requirements of the Fourth Amendment. Unlike the situation in Hopkins v. Andaya, 958 F.2d 881, 888 (9th Cir.1992), there was no violation of the decedent's constitutional rights, and thus no basis for finding the officers inadequately trained. Scott's claims against the municipal defendants must therefore be dismissed. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (per curiam) ("[N]either Monell v. New York City Dept. of Social Services, 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ], nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when ... the officer inflicted no constitutional harm.").
 
 
 16
 AFFIRMED.
 
 NORRIS, Circuit Judge, dissenting:
 
 17
 John Scott lived in a two-story apartment house in a residential neighborhood in Butte, Montana. On August 4, 1984, Mr. Scott had attempted to evict some troublesome tenants. Twice that day, Mr. Scott called the Butte-Silver Bow Law Enforcement Agency complaining of disturbances caused by these tenants. Among the police officers who responded to the calls and talked to Scott in person was Officer James Henrich. Later the same day, a neighbor called the police and reported hearing gunshots in front of Mr. Scott's building. When Officers Henrich and David Flamand of the Butte-Silver Bow Law Enforcement Agency responded to the call, they were informed that the man who allegedly fired the shots was acting "crazy" and had entered a nearby apartment.
 
 
 18
 As the District Court described the scene, the officers, with "weapons drawn ... immediately approached the door of the apartment where they had been advised the perpetrator had entered." Scott v. Henrich, Memorandum and Order (No. CV-87-003-BU) (January 3, 1991), p. 2-3. The officers then "banged and kicked the door and yelled ... 'Police, police officers, open up.' " Majority Opinion, at 914. A man, later identified as John Scott, opened the door holding a gun. Believing Scott had raised his weapon, Officer Henrich fired a shot. Officer Flamand then fired four shots into the doorway because he believed the initial shot fired came from Scott's weapon rather than from his partner's. One of his shots killed Mr. Scott. His widow, Doris A. Scott, sued on a theory that her husband's death was caused by an excessive use of force.
 
 
 19
 On appeal, faced with the harsh reality of her deceased husband's unavailability to testify, Mrs. Scott has abandoned her opposition to summary judgment based on what occurred after the officers assaulted the door. Instead, Mrs. Scott relies solely on her alternative summary judgment theory that focuses on the interval of time before the officers assaulted the door. The premise of this theory is that the officers used excessive force by creating an unreasonable risk of armed confrontation with Mr. Scott when they stormed the door without first trying to defuse a potentially deadly situation.
 
 
 20
 The majority dismisses Mrs. Scott's appellate argument with the simple statement that "the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them." Majority Opinion, at 915. The majority, however, mischaracterizes Mrs. Scott's argument. She does not argue, as the majority says, that "the officers should have used alternative measures," but rather that the alternative they did choose was objectively unreasonable. The cases the majority cites are inapposite because they hold only that the availability of less intrusive alternatives does not make otherwise reasonable police conduct unreasonable. See Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); United States v. Martinez-Fuerte, 428 U.S. 543, 556-57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976); Cady v. Dombrowski, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973) (the availability of less intrusive means does not "by itself, render [the police action] unreasonable"). Mrs. Scott does not argue that the officers' conduct was less reasonable than the alternatives. She argues simply that the decision to rush the door immediately was itself unreasonable because it created an unnecessarily high risk of an armed confrontation. See, e.g., Alexander v. City and County of San Francisco, 29 F.3d 1355, 1368 (9th Cir.1994) ("I seriously doubt a reasonable judicial officer would have authorized the immediate storming of [plaintiff's] residence by a heavily armed tactical team. Instead, he might have required exhaustion of less intrusive alternatives, like using tear gas or waiting [the plaintiff] out").
 
 
 21
 In opposition to the summary judgment motion, Mrs. Scott filed a detailed affidavit in which an expert witness expressed the opinion that the officers' conduct created an unreasonable risk of armed confrontation. The expert testified that by rushing the door heavily armed, the officers clearly violated the internal police guidelines of the Butte-Silver Bow Law Enforcement Agency. He cites the following guideline:
 
 
 22
 A barricaded suspect poses an extreme danger.... Officers should not immediately flush a barricaded suspect. Rather they should develop and proceed with a tactical plan. Officers should seal off avenues of escape and call for assistance. When a suspect is isolated, time is normally on the side of the officers.... All efforts should be made to persuade the suspect to surrender before force is used.
 
 
 23
 See Payne Affidavit, CR 122, Exh. E, at 16 (quoting Butte-Silver Bow Law Enforcement Agency Manual). The expert explained that Officers Henrich and Flamand should not have tried to flush Mr. Scott out immediately, but instead should have developed a tactical plan, sealed possible escape paths, called for back up, and tried to coax Scott into surrendering. See Payne Affidavit, CR 122, Exh. E, at 14-17.
 
 
 24
 Internal police regulations and guidelines are relevant to the question of the reasonableness of the force officers use in apprehending suspects. See Tennessee v. Garner, 471 U.S. 1, 18-19, 105 S.Ct. 1694, 1704-05, 85 L.Ed.2d 1 (1985) (considering police department policies as relevant in deciding the constitutionality of the use of deadly force); Maddox v. City of Los Angeles, 792 F.2d 1408, 1414 (9th Cir.1986) (considering the rules promulgated by the Los Angeles Police Commission, a local civilian oversight body, in determining whether a police choke-hold was reasonably applied); Peraza v. Delameter, 722 F.2d 1455, 1456 (9th Cir.1984) (approving use of police department's canine policy as evidence). The majority holds these guidelines to be irrelevant here because the guidelines were intended to protect police officers not suspects such as Mr. Scott. Majority Opinion, at 915-16. This holding is contradicted by the deposition testimony of Undersheriff Lee that the guidelines are meant, at least in part, to protect the safety of the suspect. See Second Petition for Rehearing, at 2-4. Thus, at the very least, Undersheriff Lee's testimony creates a triable issue of fact as to whether the guidelines are in fact relevant.
 
 
 25
 Mrs. Scott's expert further opined that not only did the officers' conduct violate Butte-Silver Bow Law Enforcement Agency's guidelines, they also violated contemporary police practices:
 
 
 26
 Contemporary accepted police practices recognize that immediate entry into a dwelling or other building for an armed suspect should only be attempted if there are hostages and one has information that a hostage may die or be seriously injured if one does not act immediately.
 
 
 27
 Id. at 12. The expert emphasized that under contemporary police practices, the officers should have gathered more intelligence about the identity of the person, his intentions, and his mental state. See id. at 11-12. If the officers had paused to ask just a few questions, stated the expert, they could have learned that "Mr. Scott was the landlord, that he had been drinking with [the evicted tenants], that he was fearful of them, that he had been threatened by them, and would have been happy to have the police on hand." Id. at 13. Since "[p]assage of time, without immediate resort to an assault tactic, could have diffused [sic] this situation," the expert stated that it was unreasonable for the officers to storm the door without first using a telephone or a bullhorn to try to get Scott to surrender. Id.
 
 
 28
 Viewing the evidence, especially the expert's affidavit, in a light most favorable to Mrs. Scott, see Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir.1983), I believe there are triable issues of fact whether it was reasonable to storm the door without first pursuing less confrontational alternatives.
 
 
 29
 It is true that defendants have offered deposition testimony from law enforcement officers that Officers Henrich and Flamand reacted in accordance with departmental guidelines and conventional police practices. However, Scott's expert specifically controverts such testimony and thereby creates a battle of experts on a material issue of fact, which cannot be decided at summary judgment as a matter of law. See Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir.1993) ("If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial.").
 
 
 30
 I respectfully dissent.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 [1]
 Plaintiff also names as defendants the Butte-Silver Bow Law Enforcement Agency, the City of Butte, and the County of Silver Bow. We address the claims against these defendants in section III infra
 
 
 [2]
 In fact, Scott was drunk. Very, very drunk. He had a blood alcohol content of .312
 
 
 [3]
 It's sometimes not entirely clear whom certain rules were meant to benefit, but one can generally figure this out with some degree of confidence. In fact, we ask the same question in several analogous contexts. See, e.g., Norse v. Henry Holt and Co., 991 F.2d 563, 568 (9th Cir.1993) (third party may enforce contract only if it was intended for his benefit); E. Allan Farnsworth, Contracts 388 (2d ed. 1990) (contract unenforceable as against public policy may still be enforced if the claimant belongs to the class the public policy is designed to protect); W. Page Keeton et al., Prosser and Keeton on the Law of Torts 224-25 (5th ed. 1984) (defendant's violation of a statute may be negligence per se, but only if plaintiff was part of the class the statute was meant to protect)