Opinion by Judge O’SCANNLAIN; Partial Concurrence and Partial Dissent by Judge TROTT.
OPINION
O’SCANNLAIN, Circuit Judge:
We must decide whether a reasonable jury could determine that three sheriffs deputies violated the Constitution when they fatally shot an armed homeowner on his patio.
I
A
At half past five, on the morning of March 6, 2009, Carol George awoke. Her husband Donald needed food.[1] Donald had a terminal case of brain cancer and, as a result of his chemotherapy, ate frequently to manage headaches. His wife brought him a snack and then, not having slept well, returned to bed. Shortly after, George took the keys to the couple’s truck from the night stand and went downstairs. Concerned for his well-being, Carol followed him. She witnessed him retrieve his pistol from the truck and load it with ammunition.
Carol called 911. Because she used her cell phone, the call went to the Ventura California Highway Patrol. On the audio recording in evidence, she can be heard exclaiming “No!” and “My husband has a gun!” The highway patrol dispatcher could only determine that she lived somewhere in Santa Barbara. Her husband wanted her to hang up, so she did. The dispatcher then contacted a Santa Barbara County 911 operator who called Carol back and obtained her complete address.
Deputies were dispatched to the residence for a domestic disturbance involving a firearm. Santa Barbara Sheriffs Deputies Jarrett Morris and Jeremy Rogers *1194 responded first. Carol met them at the front door. She asked them to be quiet and not to scare her husband, while also advising that he was on the patio with his gun.
The deputies decided to established a perimeter around the house. They crossed the driveway toward a gate on the east side of the property. Morris was in the lead, with Schmidt and Rogers following. They carried two AR-15 rifles in addition to their service revolvers. Unable to spot Donald, and concerned that he might use a door on the west side of the house to exit, Rogers turned back to cover, that side. Morris tried to assume a position out of - sight and Schmidt lay down in ice plants at the bottom of a steep slope near the southeast corner of the house. From his position on the ground, Schmidt could see the back of the house, which had an outdoor balcony on the second floor with a patio.
The district court concluded there was a dispute as to which officer made contact with Donald first. Morris said that Schmidt had — announcing “I see the suspect” on the radio — while Schmidt claimed that it was Morris who initially saw Donald. According to an uncontroverted police-dispatch log, at 8:08 a.m., Donald opened the door to the balcony. Once he appeared in view of the deputies, Schmidt identified himself as law enforcement and instructed Donald to show him his hands. Hearing yelling, Rogers left his post out front and headed into the backyard.
Four minutes later, dispatch was told that Donald had a fireárm in his left hand. Morris testified to seeing Donald “carrying [a] silver colored pistol in his left hand, while holding” what he described “as a walker or a buggy.”[2] Rogers stated that when George came into view, he was holding a gun with the barrel pointing down. Carol does not dispute that Donald exited onto the balcony with his walker and holding his firearm. However, the district court concluded that Carol’s evidence, which included án expert witness’s report,[3] called into question whether Donald ever manipulated the gun, or pointed it directly at deputies.[4]
Soon after the deputies broadcast that Donald had a firearm, the dispatch log records “shots fired.” Donald fell to the ground, and Rogers continued to shoot. Together the three deputies fired approximately nine shots. They then ran to assist him, applied first aid, and called an ambulance. Donald died two hours later at the *1195 hospital following surgery and admission to the intensive care unit.
B
Carol sued a year later under 42 U.S.C. § 1983 asserting two constitutional claims.[5] Against Morris, Schmidt, and Rogers she claimed a violation of her late husband’s right to be free from excessive force under the Fourth Amendment, as incorporated.[6] In a claim chiefly implicating Deputy Harry Hudley, Carol asserted that her own Fourth Amendment right against unreasonable seizure was violated when Hudley kept her from the crime scene in the shooting’s aftermath and when she was briefly stopped from visiting Donald in the hospital. The deputies and their supervisors moved for summary judgment invoking qualified immunity, mainly arguing that neither Donald’s nor Carol’s constitutional rights had been violated.
After an evidentiary hearing, the district court concluded that based on the admissible evidence, “whether Mr. George presented a threat to the safety of the deputies is a material fact that is genuinely in dispute.”[7] This meant a constitutional violation could be proven and the court denied qualified immunity on that basis. Concluding that the deputies had not argued for its application, the court did not address the second prong of qualified immunity — the clearly established inquiry. That asks whether “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Lacey v. Maricopa Cnty., 693 F.3d 896, 915 (9th Cir.2012) (en banc). As to Carol’s seizure claim, the district court decided there was no constitutional violation and, in the alternative, that “the right at issue was not clearly established.” It therefore granted summary judgment to Hudley and the other deputies.
Morris, Rogers, and Schmidt timely appeal the denial of summary judgment. Carol timely cross appeals, seeking review of the district court’s grant of summary judgment to the deputies on her unreasonable seizure claim.
II
Because Morris, Rogers, and Schmidt challenge the denial of qualified immunity we have jurisdiction over the denial of summary judgment, an interlocutory decision not normally appealable. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). However, the scope of our review over the appeal is circumscribed. See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1059-60 (9th Cir.2006). Any decision by the district court “that the parties’ evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal.” Eng v. Cooley, 552 F.3d 1062, 1067 *1196 (9th Cir.2009). Stated differently, “we may not consider questions of evidentiary] sufficiency, i.e., which facts a party may, or may not, be able to prove at trial.” Care-Partners, LLC v. Lashway, 545 F.3d 867, 875 (9th Cir.2008) (internal quotation marks omitted).
Noting that we do have authority to consider the materiality of a fact, Behrens v. Pelletier, 516 U.S. 299, 312-13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), — the issue of whether disputed facts “might affect the outcome of the suit under the governing law” — the deputies argue that Carol’s disputed facts are ancillary, and therefore immaterial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In that respect, they claim that a review of the district court’s “reasoning establishes that rather than delineating actual material disputed facts, [the court] commingled a group of insignificant discrepancies in statements” in order to conclude that a dispute existed about what had transpired during Donald’s final minutes. Although couched in the language of materiality, their argument actually goes to the sufficiency of George’s evidence. At bottom, their contention is that Carol could not “prove at trial” that Donald did not turn and point his gun at deputies. Johnson v. Jones, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).
In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before a shooting has died, our precedent permits the decedent’s version of events to be constructed circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement. See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994); Santos v. Gates, 287 F.3d 846, 852 (9th Cir.2002) (“Nowhere in our cases have we held that police misconduct may be proved only through direct evidence.”).[8] The district court applied this principle. It parsed the deputies’ testimony for inconsistencies, found that medical evidence (and Carol’s declaration) called into question whether Donald was physically capable of wielding the gun as deputies described, and found parts of Carol’s expert’s testimony probative. There were genuine disputes of fact such that a reasonable jury could “disbelieve the officers’ testimony” and rely on record evidence to conclude that Donald had not ignored commands to drop the gun, or taken other threatening measures such as pointing the weapon at deputies.
Because this inquiry, under Scott v. Henrich and its progeny, concerns genuineness — namely “the question whether there is enough evidence in the record for a jury to conclude that certain facts are true” — we may not decide at this interlocutory stage if the district court properly performed it. Kinney v. Weaver, 367 F.3d 337, 347 (5th Cir.2004) (en banc); see Abdullahi v. City of Madison, 423 F.3d 763, 772 n. 8 (7th Cir.2005) (discussing the Ninth Circuit’s approach). The dissent, however, would have us effectively cast off the interlocutory-review framework. Dissent at 1209-12. It tells us we may do so under the banner of Scott v. Harris, a case in which not a single Justice of the Supreme Court “discussed the limits of the collateral order doctrine in qualified immunity cases” or even cited the Court’s prior authorities on the subject. Blaylock v. City of Philadelphia, 504 F.3d 405, 413-14 *1197 (3d Cir.2007) (“[n]either the majority nor the dissent in Scott cited Johnson or Behrens ”).
In Johnson, a unanimous Supreme Court told us these interlocutory appeals involving qualified immunity (1) would be suited to our comparative expertise as appellate judges, centering on “abstract issues of law,” as opposed to “the existence, or nonexistence, of a triable issue of fact” and (2) would spare us from pouring over “affidavits, depositions, and other discovery materials.” Johnson, 515 U.S. at 316-17, 115 S.Ct. 2151. If we could exercise the same plenary review as the district judge below, or if we were jurors called upon to weigh the evidence, the arguments of our able colleague in dissent might persuade us. Yet, his scrutinizing of the record cannot be squared with the Johnson paradigm.[9] Even accepting for the sake of argument, though, that Scott v. Harris is meant to establish an exception to the rules for interlocutory review, the dissent does not fit within that case’s terms either. It points to no videotape, audio recording, or similarly dispositive evidence that “blatantly contradict[s]” or “utterly discredit[s]” Carol’s side of the story. Scott, 550 U.S. at 380, 127 S.Ct. 1769.[10]
Our decision not to assume Scott v. Harris implicitly abrogated a line of precedent also accords with the Supreme Court’s later guidance. In a more recent section 1983 case, the Court reaffirmed that “immediate appeal from the denial of summary judgment on a qualified immunity plea is available when the appeal presents a ‘purely legal issue.’ ” Ortiz v. Jordan, — U.S.-, 131 S.Ct. 884, 891, 178 L.Ed.2d 703 (2011); see also id. at 893 (explaining that “[cjases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted, but *1198 disputes about the substance and clarity of pre-existing law” (citing Behrens and Johnson )).[11]
Thus, in this appeal, we are confined to the question of “whether the defendants] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiffs favor.” Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1068 (9th Cir.2012).
Ill
The deputies’ appeal touches on two questions of qualified immunity. First, the deputies claim the shooting did not violate the Constitution. Second, they assert that even if Donald’s Fourth Amendment rights were violated, they did not violate law clearly established at the time they acted.
A
Usually we can start with the second prong of qualified immunity if we think it advantageous. See Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Here, though, we are not satisfied that the deputies have adequately pursued that argument. As Carol observes, the district court concluded that the deputies had not “argue[d] that the constitutional right was clearly established at the time of the alleged misconduct.” Our review of the record reveals that while they made passing references to this defense, they did not develop it in their briefing below. At an oral hearing on the motion for summary judgment, they made absolutely no reference to prong two either. “Although no bright line rule exists to determine whether a matter [has] been properly raised below, an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it.” In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 992 (9th Cir.2010) (internal quotation marks omitted).
We need not definitely decide, however, whether they waived the argument at the district court. On appeal, the deputies have not advanced an argument as to why the law is not clearly established that takes the facts in the light most favorable to Carol. See Adams v. Speers, 473 F.3d 989, 991 (9th Cir.2007) (“The exception to the normal rule prohibiting an appeal before a trial works only if the appellant concedes the facts and seeks judgment on the law.”). We will not “do an appellant’s *1199 work for it, either by manufacturing its legal arguments, or by combing the record on its behalf for factual support.” W. Radio Servs. Co. v. Qwest Corp., 678 F.3d 970, 979 (9th Cir.2012).
Although the deputies’ “briefs lapse into disputing [Carol’s] version of the facts” as to the threshold constitutional violation as well, we discern enough of a distinct legal claim to entertain that first-prong qualified immunity contention. Adams, 473 F.3d at 990.[12]
B
As to whether the deputies violated the Fourth Amendment, two Supreme Court decisions chart the general terrain. Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), defines -the excessive force inquiry, while Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), offers some guidance tailored to the application of deadly force.
“Graham sets out a' non-exhaustive list of factors for evaluating [on-the-scene] reasonability: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape.” Maxwell v. Cnty. of San Diego, 697 F.3d 941, 951 (9th Cir.2012). In Garner, the Supreme Court considered (1) the immediacy of the threat, (2) whether force was necessary to safeguard officers or the public, and (3) whether officers administered a warning, assuming it was practicable. See Scott v. Harris, 550 U.S. 372, 381-82, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Yet, “there are no per se rules in the Fourth Amendment excessive force context.” Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir.2011) (en banc).[13]
The district court applied the Graham factors and found that the first and third unmistakably weighed in Carol’s favor. “It is undisputed that Mr. George had not committed a crime, and that he was not actively resisting arrest or attempting to evade arrést by flight.” The deputies do not challenge these conclusions on appeal. They correctly observe, however, that the “ ‘most important’ factor under Graham is whether the suspect posed an ‘immediate threat to the safety of the officers or others.’ ” Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir.2010). As to this third key factor, while the deputies certainly aver feeling threatened before they shot George, such a statement “is not enough; there must be objective factors to justify such a concern.” Id. When an individual points his gun “in the officers’ direction,” the Constitution undoubtedly entitles the officer to respond with deadly force. Long v. City & Cnty. of Honolulu, 511 F.3d 901, 906 (9th Cir.2007). In Scott, we likewise recognized that officers firing their weapons at a defendant who “held a ‘long gun’ and pointed it at them” had not been constitutionally excessive. 39 F.3d at 914.
Taking the facts as we must regard them, that specific circumstance is not *1200 present in this case. In Glenn v. Washington County, we found that in a 911 scenario without flight or an alleged crime, the officers’ decision to shoot an individual holding a pocket knife, “which he did not brandish at anyone,” violated the Constitution. 673 F.3d 864, 873-78 (9th Cir.2011). Reviewing Long and Scott, we explained that the fact that the “suspect was armed with a deadly weapon” does not render the officers’ response per se reasonable under the Fourth Amendment. Id. at 872-73; see also Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir.1997) (“Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.”).
This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed — or reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat. On this interlocutory appeal, though, we can neither credit the deputies’ testimony that Donald turned and pointed his gun at them, nor assume that he took other actions that would have been objectively threatening. Given that version of events, a reasonable fact-finder could conclude that the deputies’ use of force was constitutionally excessive. Contrary to the dissent’s charge, we are clear-eyed about the potentially volatile and dangerous situation these deputies confronted. Yet, we cannot say they assuredly stayed within constitutional bounds without knowing “[w]hat happened at the rear of the George residence during the [four minutes between when] Mr. George walked out into the open on his patio and the fatal shot.” Dissent at 1209. That is, indeed, “the core issue in this case.” Id.
The deputies argue that the reasonableness of their actions is enhanced because they were told to expect a domestic disturbance. Sitting en banc, this court recently identified this circumstance as a “ ‘specific factor[]’ relevant to the totality of the[] circumstances.” Mattos, 661 F.3d at 450. Domestic violence situations are “particularly dangerous” because “more officers are killed or injured on domestic violence calls than on any other type of call.” Id. At the same time, we explained in Mattos that the legitimate escalation of an officer’s “concern[ ] about his or her safety” is less salient “when the domestic dispute is seemingly over by the time the officers begin their investigation.” Id. Years before that we had held — in another en banc decision — that a husband’s criminal abuse of his spouse “provide[d] little, if any, basis for the officers’ use of physical force” because when law enforcement “arrived [the husband] was standing on his porch alone and separated from his wife.” Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir.2005) (en banc). That distinguishing feature from Smith and Mattos is present here. Carol was unscathed and not in jeopardy when deputies arrived. Donald was not in the vicinity; instead he was said to be on the couple’s rear patio.
Today’s holding should be unsurprising. If the deputies indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by Pearson, 555 U.S. at 227,129 S.Ct. 808.[14]
*1201 IV
Owing to the obligation to be satisfied of our jurisdiction, we asked the parties to address at oral argument whether Carol’s cross appeal had been well taken. Her counsel conceded it had not., In contrast to the situation in which an officer denied immunity finds himself, Carol will not lose any right by having appellate review of her unreasonable seizure claim deferred until final judgment. See LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester, 96 F.3d 598, 599 (2d Cir.1996) (per curiam).[15]
We therefore lack appellate jurisdiction over Carol’s cross appeal in its entirety.
V
For the foregoing reasons, the cross appeal is DISMISSED for lack of jurisdiction. We also conclude that the facts, as we must regard them, show that Santa Barbara Sheriffs Deputies Morris, Rogers and Schmidt could be found to have violated the Fourth Amendment’s prohibition on excessive force. They are therefore not entitled to.qualified immunity on that basis.
AFFIRMED IN PART, DISMISSED IN PART.- The parties shall bear their own costs on appeal.

. We adopt Carol’s "version of the facts,” as she is the non movant. Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Part II of our opinion explains why we cannot agree with our dissenting colleague that we are at liberty to prefer the deputies’ version in this interlocutory appeal.

. A silver Walther pistol was recovered from Donald after the incident.

. Although various medical opinions of his were stricken by the district court, Thomas R. Parker (a former FBI agent and California police officer) provided an expert report. It gave perspective on how the deputies’ accounts compared with typical police behavior and contained opinions about how the physical layout of the property may have influenced the deputies’ and Donald’s on-the-scene perceptions.

. Morris offers a vivid account of Donald's final moments that we cannot credit because the district court found it to be genuinely disputed. See infra Part II. According to him, although Donald initially had the pistol braced against his walker, soon after, Donald reached for what Morris thought was its safety and grasped the gun with both hands. Then in Morris's words:
[Donald] made the final motion at the rear of the pistol and I said to myself ... if he raises that gun any higher he’s going to be aiming at [Schmidt] and ... I gotta [sic] take that shot and ... at that moment as he’s raising, he doesn't get higher th[a]n the wall he immediately turns straight east and raises it'and is now pointing it directly at me and I had nowhere to go. I’m, I’m crouched down and I’m, I remember seeing the, the black hole actually looking down the barrel as it’s pointed right at me and that was when, that was when I fired my first shot.

. She also raised a variety of state-law causes of action. Because it is undisputed "that resolution of the federal constitutional claims would necessarily dictate the resolution of the state law claims,” we do not address them separately.

. “A claim under 42 U.S.C. § 1983 survives the decedent if the claim accrued before the decedent’s death, and if state law authorizes a survival action.” Tatum v. City & Cnty. of San Francisco, 441 F.3d 1090, 1093 n. 2 (9th Cir.2006) (citing 42 U.S.C. § 1988(a)). Carol's complaint alleges that she is the personal representative of her husband’s estate in full compliance with California law. She therefore may litigate his Fourth Amendment claim. See id.; Cal.Civ.Proc.Code §§ 377.30, 377.32.

.Like the dissent, in the context of the district court’s preceding analysis, we understand this statement for what it is: a determination that the facts about how Donald and the deputies had behaved prior to the shooting were contested. See Dissent at 1206.

. Other circuits emulate this approach. See, e.g., Lamont v. New Jersey, 637 F.3d 177, 181-82 (3d Cir.2011); Abdullahi v. City of Madison, 423 F.3d 763, 772 & n. 8 (7th Cir.2005) (describing the role of a police practices expert and explaining the centrality of inferences “when the plaintiff’s sole eyewitness is dead”).

. Our conclusion that the Johnson principle still applies today is by no means idiosyncratic. In the years since Scott v. Harris (a 2007 decision), we have consistently held that our court lacks the power to reassess facts on interlocutory review. The 2009 Eng decision could not be clearer about what our circuit’s law prescribes, see Dissent at 1210, and there are many other precedents to the same effect. See, e.g., Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1067-68 (9th Cir.2012) (explaining that "[ujnder the collateral order doctrine[,].... [wjhere there are disputed issues of material fact, our review is limited to whether the defendant would be entitled to qualified immunity as a matter of law”); Conner v. Heiman, 672 F.3d 1126, 1130 n. 1 (9th Cir.2012) (explaining that under Johnson it is only when the "disputes involve what inferences properly may be drawn from ... historical facts that are not in dispute”, that an interlocutory appeal will lie (alteration in original) (internal quotation marks omitted)); Alston v. Read, 663 F.3d 1094, 1098 (9th Cir.2011) (jurisdiction existed because appellants were “not contesting the district court’s conclusion that genuine issues of fact exist for trial” but instead were "appealing the purely legal issue of whether they violated Alston's clearly established federal rights”).

. After reciting the summary judgment standard, the Scott v. Harris Court explained "[tjhere is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals.” 550 U.S. at 378, 127 S.Ct. 1769. While the dissent frames a bystander’s recollection as that sort of smoking gun, all it might establish is that a warning was uttered. Dissent at 1213-14. Still crucial (and unknown) is how Donald responded.
Our colleague in dissent also contends that none of the opinions of the police practices expert are admissible. See Dissent at 1217. We will not join issue on this point because the deputies expressly disclaim an evidentiary challenge to Parker’s opinions under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Unlike the dissent we are not convinced that Wilkinson v. Torres, 610 F.3d 546, 550 (9th Cir.2010) is necessarily to the contrary, for there we confirmed that "[o]ur jurisdiction to review an interlocutory appeal of a denial of qualified immunity ... is limited exclusively to questions of law.” The panel chiefly "looked past the district court’s conclusion,” Dissent at 1210, with respect to the legal significance to be assigned plaintiff's facts. See, e.g:, Wilkinson, 610 F.3d at 552 ("While perhaps-true as far as it goes, [plaintiff's] version omits the urgency of the situation.”). Admittedly, though, other parts of the opinion do read as though the appeal arose from the grant of summary judgment. See id. at 553.
Although Wilkinson cited Scott v. Harris in service of that approach, its author (Judge Tashima) has taken the position that Wilkinson did not "address[ ] the jurisdictional defect that ... [fact-related] issues potentially raise under Johnson." Conatser v. N. Las Vegas Police Dep’t, 445 Fed.Appx. 932, 933 (9th Cir.2011) (per curiam) (a panel including Judge Tashima dismissed for lack of appellate jurisdiction officer-defendants’ claim that "the evidence cannot support the inference that [the decedent] never attacked them”). We agree that this is the fairest reading of Wilkinson. And, because "unstated assumptions on non-litigated issues are not precedential holdings binding future decisions,” that case does not dictate how this appeal ought to be resolved. Proctor v. Vishay Intertech., Inc., 584 F.3d 1208, 1226 (9th Cir.2009).

. Our decision on the clearly established issue does not prevent the deputies from appropriately raising the second prong of qualified immunity at a subsequent stage in the litigation, such as in a Rule 50 motion for judgment as a matter of law. See Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d 1075, 1080-81 (9th Cir.2009); Ortiz, 131 S.Ct. at 889.

. See Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir.2010) (courts must “examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in Graham ”) (internal quotation marks omitted), and Harris, 550 U.S. at 382, 127 S.Ct. 1769 {“Gamer did not establish a magical . on/off switch that triggers rigid preconditions whenever an officer’s actions constitute ‘deadly force.’ ”).

. Carol advances another argument about the unconstitutionality of the shooting which necessarily fails and should be excluded at trial. Specifically, she faults the deputies for (1) not gathering intelligence from her before *1201 heading to the backyard, (2) bringing assault rifles, and (3) failing to "set up a non-confrontational, 'soft' perimeter around the house.” Although at one time Ninth Circuit law did permit these kind of considerations to inform the subsequent excessive force inquiry, "[w]e have since placed important limitations” on that line of argument. Billington v. Smith, 292 F.3d 1177, 1188 (9th Cir.2002); see also Espinosa v. City & Cnty. of San Francisco, 598 F.3d 528, 547-49 (9th Cir.2010) (Wu, J„ dissenting) (detailing how our law has receded).
In Billington, we explained that intervening caselaw, since Alexander v. City & County of San Francisco, 29 F.3d 1355, 1366-67 (9th Cir. 1994), "prevent[s] a plaintiff from avoiding summary judgment by simply producing an expert’s report that an officer’s conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.” 292 F.3d at 1189. Then, harmonizing Alexander "with the Supreme Court's admonition in Graham," we explained that a plaintiff cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.” Id. at 1190. At most, Carol’s cited failings amount to negligence. Only when "an officer intentionally or recklessly provokes a violent response, and [when] the provocation is an independent constitutional violation” will that conduct color the subsequent excessive force inquiry. Id. Moreover, her proposed alternative measures are plagued with the sort of hindsight bias the Supreme Court has forbidden. See id. at 1191.

. “All circuits that have considered whether the collateral order doctrine confers appellate jurisdiction over appeals arising from a grant of partial summary judgment based on qualified immunity have universally held that such a judgment is not immediately appealable.” Id. (collecting cases). Pendent appellate jurisdiction might be exercised over nonreviewable interlocutory decisions that raise issues "inextricably intertwined” with matters properly appealed. Cunningham v. Gates, 229 F.3d 1271, 1284 (9th Cir.2000). But as Carol’s counsel rightly appreciated, the claim that deputies unconstitutionally seized Carol involves different facts and legal standards from those germane to whether deputies used excessive force when they shot Donald. See id. at 1285.