**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD A. COLLENDER, individually and as successor in interest to Julian Stanley Collender; YEN P. COLLENDER, individually and as successor in interest to Julian Stanley Collender,<br><br>　　　　　Plaintiffs - Appellees,<br><br>　v.<br><br>CITY OF BREA,<br><br>　　　　　Defendant,<br><br>and<br><br>SHAWN NEEL, individually; et al.,<br><br>　　　　　Defendants - Appellants. | No. 13-55438<br><br>D.C. No. 8:11-cv-00530-AG-MLG<br><br>Santa Ana<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted February 12, 2015
Pasadena, California

---

　　　[*]　　This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Before: GRABER and WARDLAW, Circuit Judges, and MOLLOY,[**] Senior District Judge.

City of Brea Police Department Detective Shawn Neel ("Neel") appeals the district court's denial of his motion for summary judgment based on qualified immunity. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm. Because the parties are familiar with the procedural history, we need not recount it in detail here.

## I.

Detective Neel was off duty shortly before midnight on June 30, 2010, when his partner Detective Michael Johnson ("Johnson") called him asking for help with an investigation. An armed robbery had allegedly taken place earlier that night, and Julian Collender ("Julian")[1] was the suspect. Johnson told Neel the suspect "had committed a robbery with a handgun and had threatened to kill the victim's family." Johnson, concerned that Julian might go to the victim's home, asked Neel to assist only with surveillance of Julian's residence to make sure Julian didn't

_____

[**] The Honorable Donald W. Molloy, Senior District Judge for the U.S. District Court for the District of Montana, sitting by designation.

[1] Appellees are the parents of Julian Collender. References to "the Collenders" are therefore to the appellees. We refer to Julian Collender as "Julian" for sake of clarity.

2

leave. Johnson gave Neel Julian's address in Yorba Linda and a description of Julian's red Nissan. He also told Neel that Julian had no history of violence.

Neel arrived at Julian's street address shortly after midnight driving an unmarked grey Cadillac, and he observed a red Nissan parked in Julian's driveway. Neel was not in uniform, but he was wearing a Brea Police Department badge, which hung around his neck, and a ballistic vest marked on the front right breast and back center with the word "POLICE." He was armed with a patrol rifle, his duty handgun, and a backup handgun. He parked about two houses away (north) from Julian's residence, on the opposite side (west) of the street. Neel was seated in the driver's seat, and he was holding his rifle. Two other officers, Rich Salcido ("Officer Salcido") and Adam Wambaugh, were in marked patrol cars at opposite ends of the street. If Julian left his residence, Neel was supposed to inform the uniformed officers, who would then execute a felony traffic stop.

At 12:24 a.m., Neel saw Julian leaving his house, watching as he got into his car. Julian turned on the dome light of the car and reached into the back seat. As Julian backed out of his driveway, Neel notified Officer Salcido by radio that Julian was leaving and heading "northbound."

The parties dispute what happened next. Neel testified that when Julian drove past Neel's parked car, he stopped next to it so that his driver side window

3

was a few feet away from Neel's driver side window. Julian shined a light at Neel's tinted window for about 10 seconds. Neel's seat was reclined, and he tried to hide his head behind the frame of the car between the front and rear doors. Julian began to drive away but then made a u-turn and drove back toward Neel's car. Julian again stopped next to Neel's car so that his passenger side window was a couple feet away from Neel's driver side window, and again shined a light into Neel's window for about 10 seconds. Julian then drove forward, stopped his car in front of Neel's car in the lane of traffic, and got out. Standing in front of Neel's car, Julian shined a light into the front, untinted windshield. Believing that his cover had been blown and that his life was in danger, Neel gave a "code three (red lights and siren)" request to the nearby officers over the radio but then got out of his car.

The Collenders deny their son drove his car back and forth or shined a light into Neel's vehicle. They also dispute whether Neel feared for his life. In doing so, they question Neel's credibility, stating, "In sum, Neel is not a credible witness, and Plaintiffs dispute his uncorroborated account of the incident." They also point out that these events were not captured in any radio call. The final location of the two vehicles appears to be consistent with Neel's story, and a small flashlight was later found at the scene. Additionally, Neel testified that while Julian was driving

4

back and forth and prior to Neel's final radio call before leaving his car, he tried to radio for help but pushed the wrong button.

Neel testified that he got out of his car and pointed the rifle he was holding at Julian. He "walked in the general direction towards [Julian's] vehicle in order to follow [him] as he backpedaled away from [Neel]." Neel testified that he identified himself as a Brea police officer and told Julian "to get his hands up and drop to the ground." The Collenders dispute whether Neel identified himself as a police officer and whether he gave this command. They rely on the testimony of the only other known witness to this part of the incident, a high school student who was watching from the window of her nearby house. The witness testified that she "heard voices shouting," and the only word she remembered "clearly is the word 'freeze.'" She testified that she did "not recall anyone saying 'put your hands up' or identifying themselves as a police officer."

The parties agree that at this point, Officer Salcido arrived at the scene, and the camera in his patrol car recorded the incident. The video shows Julian and Neel standing near Julian's car with Neel pointing his rifle at him. Julian then turns his back to Neel and runs across the street (in the direction of his residence). Neel follows with the rifle still pointed at Julian. Julian then stops before he

5

reaches the curb and turns to face Neel while holding his hands in the air away from his body.

The video shows that while keeping his right hand in the air, Julian moved his left hand down toward his left front pants pocket. The parties disagree about the details of Julian's left hand movement. Neel testified that he saw Julian put his hand into his pocket and believed he was reaching for a weapon. The Collenders claim the video shows their son's hand did not go into his pocket and offer alternative reasons why he moved his hand downward. The video is not definitive on whether Julian's hand went into the pocket.[2] Upon seeing the movement of Julian's left hand, Neel told him to "drop down on your face" and 1/5th of a second later fired the rifle a single time into Julian's chest. Julian fell to the ground. The entire sequence of events shown on the video took less than 10 seconds.

Officer Salcido immediately approached Julian and Neel. Neel continued to point the rifle and yell commands at Julian, who was laying prone on the ground. Paramedics arrived about 10 minutes after the shooting and pronounced Julian dead approximately an hour later. It is undisputed that Neel did not see Julian with

---

[2] Each of the panel members reviewed the videotape. It is obvious, in light of the dissent, that the three panel members did not come away from that viewing with a unified version of the gesture that allegedly caused Neel to subjectively fear for his life; testimony that is in any event irrelevant to our inquiry.

a gun or see a bulge that might have been a gun in Julian's pocket. It is also undisputed that Julian did not verbally threaten Neel.

## II.

We have jurisdiction under 28 U.S.C. § 1291 "over an interlocutory appeal where the ground for the motion in question is qualified immunity." *Wilkins v. City of Oakland*, 350 F.3d 949, 951 (9th Cir. 2003). Our review is generally limited to issues of law, which we review de novo. *Id.* at 951, 954. "Any decision by the district court that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal." *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (internal quotation marks omitted). "Where disputed facts exist, we will determine if the denial of qualified immunity was proper by assuming that the version of events offered by the non-moving party is correct." *Wilkins*, 350 F.3d at 951. The principle that summary judgment should be granted sparingly in excessive force cases "applies with particular force where the only witness other than the officer[] was killed during the encounter." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc).

## III.

The denial of qualified immunity is appropriate where "(1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the

7

officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1051–52 (9th Cir. 2014) (internal quotation marks omitted). There is a difference in excessive force cases between the ideas of qualified immunity and absolute immunity.

A.

"[T]he use of force is contrary to the Fourth Amendment's prohibition against unreasonable seizures, if that force is excessive as measured by objective standards of reasonableness." *Wilkins*, 350 F.3d at 954 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). To determine reasonableness, "we balance 'the nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'" *Green*, 751 F.3d at 1049 (quoting *Graham*, 490 U.S. at 396). There is no question that the degree of intrusion here was severe as Neel killed Julian. The inquiry, therefore, becomes whether the intrusion was justified by the governmental interests by "looking at (1) how severe the crime at issue [was], (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to

evade arrest by flight." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (citing *Graham*, 490 U.S. 386).

Under the *Graham* factors, the district court properly concluded that Neel is not entitled to summary judgment on the basis that his conduct was constitutionally protected. The alleged crime at issue, a reported armed robbery that occurred hours earlier, did not alone justify lethal force, and the video shows that Julian was not actively resisting arrest at the time of the shooting. The parties therefore agree that the critical factor is whether Julian posed an immediate threat to Neel's safety. Contrary to the dissent's view, we must assume that the version of events offered by the Collenders is correct. *Wilkins*, 350 F.3d at 951. According to the material facts offered by them, Neel knew that Julian was suspected of armed robbery and that he had allegedly threatened to kill the victim's family earlier that evening. He also knew Julian had no history of violence. Neel was assigned to monitor Julian's home and alert the officers who were parked nearby if Julian left his house. After Julian left his house and got into his car, Neel saw Julian reach into the back seat and then back out of the driveway and drive northbound past Neel. Julian then turned around, parked his car in front of Neel's car, and got out of his vehicle. Neel, wearing a ballistic vest and badge, left his vehicle and pointed his rifle at Julian; he did not identify himself as an officer, and he told Julian to "freeze."

9

Julian ran across the street away from Neel and then turned to face Neel with his arms stretched away from his body. Neel charged after Julian and continued to point his rifle at Julian. Julian then moved his left hand downward. Upon seeing this movement, Neel shot Julian in the chest at close range with a high powered rifle. Under these facts, a reasonable jury could determine that Julian did not pose an immediate threat and that it was objectively unreasonable for Neel to use deadly force against him.

Other circumstances further support the district court's denial of summary judgment. Although Neel saw Julian reach into the back seat of his car, Neel did not see Julian with a gun or a bulge that might have been a gun in Julian's pocket, and Julian did not verbally or physically threaten Neel. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (considering immediacy of threat and whether suspect threatened officer). If Neel indeed told Julian to "get down on your face" after seeing Julian's left hand movement, it is undisputed that he did not warn Julian that he would shoot; Neel fired just 1/5th of a second later, hardly enough time for Julian to respond even to the command "freeze." *Id.* (considering whether, "where feasible, some warning has been given").

Furthermore, a jury must resolve the factual issues identified by the district court. The parties dispute the events that occurred after Julian left his driveway but

10

before the video footage began.  Neel argues, and the dissent agrees, that the Collenders did not offer any evidence from which a juror reasonably could infer that Neel fabricated the story about Julian's actions when he drove past Neel's car. However, we are without jurisdiction to review arguments about the sufficiency of the evidence supporting disputed facts.  *George*, 736 F.3d at 834; *see also Cunningham v. Gates*, 229 F.3d 1271, 1286 (9th Cir. 2000) ("[I]f the appellant argues that, contrary to the district court's opinion, an examination of the record reveals that a factual dispute does not exist, or that there is not sufficient evidence in the record to create such a factual dispute, we must dismiss for lack of jurisdiction.").  Instead, we must determine whether the denial of qualified immunity was proper by assuming that the version of the events leading up to the shooting offered by the Collenders is correct.  *Wilkins*, 350 F.3d at 951.

The parties also dispute whether or not Julian's left hand went into his pocket.  The video does not clearly show Julian's hand movement just prior to the shooting.  Contrary to the approach taken by the dissent, this disputed fact must be construed in the light most favorable to the Collenders.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).  As such, the district court properly denied summary judgment.  *See George*, 736 F.3d at 838 ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or

11

serious verbal threat might create an immediate threat. On this interlocutory appeal, though, we can neither credit the deputies' testimony that [the decedent] turned and pointed his gun at them, nor assume that he took other actions that would have been objectively threatening. Given [the non-moving party's] version of events, a reasonable fact-finder could conclude that the deputies' use of force was constitutionally excessive.").

B.

The parties agree that it was clearly established at the time of the shooting that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead" in the absence of "the suspect pos[ing] a threat of serious physical harm." *Garner*, 471 U.S. at 11. Thus, the district court properly determined Neel is not entitled to qualified immunity on the basis that the constitutional right was not clearly established.

**AFFIRMED**.

12

<u>Collender v. Neel</u>, No. 13-55438

GRABER, Circuit Judge, dissenting:

I respectfully dissent. Qualified immunity should protect Neel from liability. <u>See</u> <u>Stanton v. Sims</u>, 134 S. Ct. 3, 4–5 (2013) (per curiam) ("'The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009))). Qualified immunity is meant to protect government officials from litigation; it is an immunity from suit, not merely a defense. <u>Pearson</u>, 555 U.S. at 231. Moreover, the protection applies even if the defendant made a mistake of fact. <u>Id.</u>

The majority relies on a series of factual disputes that are not relevant to the question whether qualified immunity applies. The majority notes, for example, that the parties dispute whether Collender's left hand actually entered his left front pants pocket. Maj. at 11. The majority also points out that the parties offer "alternative reasons why [Collender] moved his hand downward." <u>Id.</u> at 6. But those facts are not relevant to the determination whether a reasonable officer in Neel's position would have feared for his life.

The <u>relevant</u> facts are not in dispute. It is undisputed that Collender was a suspect in an armed robbery, in which a handgun was used, that had occurred a few

hours before the night-time fatal encounter and that Collender had threatened to kill the robbery victim's family. It is also undisputed that, shortly before Neel shot him, Collender had reached into the back seat of his car. The video shows that, as Neel approached Collender on a dark street, Collender's hands were raised, initially. But Collender quickly leaned slightly to the side and reached one hand down to his hip, where it was out of sight. He was wearing a loose, untucked shirt. At that moment, any reasonable officer would have thought that Collender could be reaching for a gun in his pocket or waistband, and any reasonable officer would have feared for his life.[1] There is no claim of police provocation.

Although the majority disposition asserts that there is a dispute, Maj. at 11–12, no evidence contradicts Neel's testimony that Collender had stalked Neel's car and had failed to obey some of his commands, nor does any evidence contradict Neel's testimony that he subjectively feared for his life at the moment he fired his weapon. Plaintiffs' <u>belief</u> as to Neel's state of mind, without evidence supporting that belief, is not cognizable evidence. See <u>Carmen v. S.F. Unified Sch. Dist.</u>, 237 F.3d 1026, 1028 (9th Cir. 2001) ("A plaintiff's belief that a defendant

---

[1] Any observer reviewing the video will see the same gesture. What the panel members "see" differently is not the gesture itself; rather, we interpret differently the significance of that gesture and how a reasonable officer would respond to it.

2

acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive. To be cognizable on summary judgment, evidence must be competent."). In any event, the evidence that Plaintiffs offered suggested that Neel was <u>too quick</u> to fear for his life, but no evidence even hints that he was not, in fact, fearful.

In the circumstances described above, the use of deadly force was reasonable. <u>See</u> <u>Scott v. Henrich</u>, 39 F.3d 912, 914 (9th Cir. 1994) ("An officer's use of <u>deadly</u> force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" (quoting <u>Tennessee v. Garner</u>, 471 U.S. 1, 3 (1985))). Accordingly, I would reverse.